**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATIONWIDE LIFE INSURANCE
COMPANY,
  *Plaintiff-Counterdefendant,*

v.

ANGELINA RICHARDS,
  *Defendant-Counterclaimant-*
       *Appellant,*

and

KEITH RICHARDS, Guardian *Ad
Litem* for BRYCE RICHARDS and
KENDALL RICHARDS,
*Defendant-Crossclaimant-Appellee.*

No. 06-56562

D.C. No.
CV 02-7583 CAS
(RNBx)

OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
May 6, 2008—Pasadena, California

Filed August 28, 2008

Before: Kim McLane Wardlaw and Sandra S. Ikuta,
Circuit Judges, and Jeremy Fogel, District Judge*

Opinion by Judge Fogel

---

*The Honorable Jeremy Fogel, United States District Judge for the
Northern District of California, sitting by designation.

11867

## COUNSEL

Richard L. Garrigues (argued) and Varoujan Nalbandian, Torrance, California, for the appellant.

Richard E. Haskin (argued), Gibbs, Giden, Locher & Turner LLP, Los Angeles, California, for the appellee.

## OPINION

FOGEL, District Judge:

Nationwide Life Insurance Company ("Nationwide") brought this non-statutory interpleader action to resolve conflicting claims to the proceeds of a one million dollar insurance policy written on the life of Bryan Richards ("Bryan"), who was murdered on December 21, 2001. Bryan's wife,

Angelina Richards ("Angelina"), appeals the district court's judgment against her and in favor of Bryan's brother, Keith Richards ("Keith"), in his role as guardian *ad litem* for Bryce and Kendall Richards ("Bryce" and "Kendall"), the two minor children of Bryan and Angelina. Following a bench trial, the district court made a factual determination that Angelina conspired in, aided, and abetted Bryan's murder, and thus is disqualified from receiving any proceeds of the life insurance policy under California law. Angelina asserts error in the district court's treatment of her pretrial assertion of the Fifth Amendment privilege against self-incrimination and in its admission of the deposition testimony of witness Gerald Strebendt. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I. BACKGROUND

Angelina and Bryan married in 1998. In 2001, Bryan obtained a life insurance policy from Nationwide in the amount of one million dollars, effective in September of that year. The policy names Angelina as the primary beneficiary and names Bryce and Kendall as alternate beneficiaries. Bryan was murdered on December 21, 2001 by means of non-ligature manual strangulation. A state court jury subsequently convicted Rafiel Torre ("Torre") of the murder; Torre's appeal of that conviction is pending.

Angelina sought an advance on the policy proceeds within days after Bryan's death, made a formal claim for the proceeds on January 30, 2002, and received a $50,000 advance on March 5, 2002. On September 27, 2002, pursuant to Rule 22 of the Federal Rules of Civil Procedure, Nationwide filed its complaint in interpleader in the district court. The complaint names Angelina, Bryce and Kendall as defendants. Keith subsequently was appointed guardian *ad litem* for Bryce and Kendall.

Angelina filed a cross-claim against Keith and a counter-claim against Nationwide, seeking a declaration that she is entitled to the proceeds as the primary named beneficiary under the policy. Keith filed a cross-claim against Angelina, seeking a declaration that Bryce and Kendall are entitled to the proceeds, and seeking return of the $50,000 that Nationwide advanced to Angelina. Keith asserted that Angelina conspired in Bryan's murder, thus disqualifying herself from receiving any proceeds of the policy, and that as a result the policy benefits are payable to Bryce and Kendall as the alternate named beneficiaries.[1] Nationwide deposited the policy proceeds into the district court's registry and was granted judgment in interpleader.

The district court conducted a bench trial and thereafter issued Findings of Fact and Conclusions of Law ("FFCL") in which it determined that Angelina did conspire in, aid, and abet Bryan's murder, and thus is disqualified from receiving any proceeds from the policy. The district court entered judgment against Angelina and for Keith as guardian *ad litem* for Bryce and Kendall. The FFCL contain a lengthy narrative describing the events leading up to Bryan's murder and the evidence presented at trial, summarized as follows:

Angelina met Torre at a nightclub in July or August 2001. Torre competed professionally in hand-to-hand mixed martial arts and also was a martial arts instructor. Sometime thereafter, Angelina and Torre became lovers. Angelina testified at trial that her relationship with Torre did not become romantic until after Bryan's death. Several other witnesses testified that by the fall of 2001 Angelina's marriage was strained, that

---

[1] California Probate Code § 252 provides that: "[a] named beneficiary of a bond, life insurance policy, or other contractual arrangement who feloniously and intentionally kills the principal obligee or the person upon whose life the policy is issued is not entitled to any benefit under the bond, policy, or other contractual arrangement, and it becomes payable as though the killer had predeceased the decedent." Cal. Prob. Code § 252.

Bryan spoke of divorcing her, and that Angelina and Torre were seen together regularly, acting in a manner that suggested they were having an affair. In September 2001 Angelina loaned Torre $10,000, and in October 2001 she co-signed Torre's lease for commercial space to start a martial arts studio. The property manager testified that Bryan was not a party to the negotiations or the lease, and that Angelina and Torre never mentioned Bryan. Angelina testified that she and Bryan had problems but were committed to staying married.

At approximately 11:00 p.m. on December 21, 2001, Angelina called Keith's wife, Lisa Richards ("Lisa"), and stated that she did not know where Bryan was. Angelina called the police the following morning, December 22, to report Bryan missing. Angelina also called Keith and told him that Bryan had planned to go to a warehouse to pick up Christmas gifts stored there. Angelina asked Keith to check the warehouse. Keith did so, but found no evidence that Bryan had been there recently. Sometime on the afternoon of December 22, Bryan's brothers, Keith and Matthew Richards ("Matthew"), visited Angelina at home. Angelina was drinking wine with a female friend. Keith testified that he noticed Bryan's insurance policy binder on the kitchen table; that he asked Angelina if she had found Bryan's life insurance policy, and she said that she had not; and that later that evening the policy binder was moved to the top of the washing machine in the laundry room, where it was partially hidden under a pile of clothes.

Keith testified that at some point he asked Angelina where Bryan's white utility truck was, and that Angelina said Torre had it. Bryan had let Torre drive the truck in the past. At Keith's request, Angelina called Torre and asked him to bring the truck to the house. When Torre arrived, Matthew looked in the truck's lock box for Bryan's Glock handgun, which normally was kept there, but the gun was gone. Keith testified that while he and Matthew were outside near the truck, Angelina and Torre spoke to each other in the doorway of the house. Torre left with Bryan's utility truck, after which Ange-

lina stated for the first time that Bryan had gone to the store to buy firewood. According to Keith, Angelina asked him to search for Bryan at nearby grocery stores. Keith and Matthew left the house at about 9:00 p.m. to do so. Approximately twenty minutes later, they discovered Bryan's other pick-up truck in the parking lot of a nearby Albertson's market. Bryan's body was in the bed of the truck. He had been strangled.

On the following morning, December 23, sheriff's detectives interviewed Angelina, other members of Bryan's family, and Torre. When asked about life insurance, Angelina stated that Bryan had life insurance but that she did not know the amount of the death benefit. Angelina told the detectives that at one time Bryan had been involved with a man named Thomas Esparza ("Esparza") in a scheme involving the receipt and sale of stolen medical equipment, and that both Bryan and Esparza had been convicted of crimes arising out of that scheme. Angelina stated that after his release from prison earlier in the year, Esparza frequently had called the Richards' home, had attempted to extort money from Bryan, and had argued with Bryan. Torre likewise told the detectives about Bryan's conflict with Esparza. Neither Angelina nor Torre told the detectives about their relationship.

Sometime later that day, or within a few days, Angelina spoke with the insurance agent who sold Bryan the policy, Phil Beh ("Beh"), and inquired whether the death benefit was $500,000 or $1,000,000. Beh testified that Angelina called him, while Angelina testified that Beh called her. Beh further testified that he and Angelina spoke several times in the days after Bryan's death, and that Angelina asked for an advance on the policy's benefits. Beh characterized the promptness of Angelina's inquiry as surprising, atypical and odd. Beh also testified that Angelina was calm and unemotional during their conversations. Angelina made a formal claim for the policy proceeds on January 30, 2002, and received a $50,000 advance on March 5, 2002. Six days later, on March 11,

Angelina purchased a vacation package to Cancun, Mexico for herself and Torre. Witnesses testified that Torre constantly was at Angelina's home beginning approximately two weeks after Bryan's death.

Lisa testified that she and Matthew's wife, Linda Richards ("Linda"), invited Angelina out for the evening of February 16, 2002, Bryan's birthday. According to Lisa, Angelina stated on that occasion that Bryan was a drug dealer, that the sheriff's department had recovered the drug "ecstacy" in Bryan's pick-up truck, and that there was an ongoing investigation into a possible link between Bryan's drug activities and his death. Sheriff's detectives testified that no drugs were found in Bryan's truck and that they never suspected Bryan of dealing drugs.

## A. Deposition Testimony Of Gerald Strebendt

Gerald Strebendt ("Strebendt"), a close personal friend of Torre, did not testify in person at the trial. The district court admitted his prior deposition testimony over Angelina's objection. The court found that Strebendt resided in North Bend, Oregon, and thus that his deposition testimony was admissible under former Rule 32(a)(3)(B) of the Federal Rules of Civil Procedure, now Rule 32(a)(4)(B).[2] That provision states in relevant part that a party may use the deposition of a witness at a hearing or trial if the court finds "that the witness is more than 100 miles from the place of hearing or trial." Fed. R. Civ. P. 32(a)(4)(B) (formerly Fed. R. Civ. P. 32(a)(3)(B)). The court rejected as unsupported by the evidence Angelina's assertion that Strebendt in fact resided in Los Angeles, California, and thus was not subject to the applicable provision.

---

[2]Rule 32 was amended effective December 1, 2007 as part of a general restyling of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 32 & note. The provision relied upon by the district court now appears at Rule 32(a)(4)(B) without substantive change.

Strebendt is a professional fighter and martial arts instructor, and a former U.S. Marine sniper and sniper instructor. He was deposed on February 13 and 14, 2004, at which time he testified that he met Angelina through Torre in early September 2001, and that later the same month he witnessed Angelina and Torre get Bryan intoxicated so that the two of them could spend the evening together without Bryan's knowledge. Angelina testified at trial that the idea to get Bryan intoxicated was proposed by others, and that while she drove Torre to his car after Bryan went home, she did not have a sexual encounter with Torre that night.

During his deposition, Strebendt testified that Angelina told him that she and Torre were having an affair. Strebendt also testified that he saw Angelina give Torre $10,000 in cash, and that shortly afterward Torre said the following: "Angelina just wishes she could be rid of Bryan, she wishes he was just gone . . . and she's even willing to pay somebody $10,000 to do it . . . and she knows you [Strebendt] were a sniper in the Marines and she wanted to know if you're interested . . . ." Strebendt stated that he told Torre that he would not kill Bryan.

According to Strebendt, Torre called him several times in late December and early and mid-January, stated that Bryan had been killed, and emphasized his need to see Strebendt in person. Strebendt testified that when he met with Torre in early or mid-January 2002, Torre admitted to killing Bryan but claimed that it was self-defense. Torre said that Bryan accused him of having an affair with Angelina and pointed a Glock handgun at him. Torre claimed that he knocked the gun from Bryan's hands and applied a choke hold known in Brazilian Ju-Jitsu as "Mata Leon," or "To Kill the Lion." According to Strebendt, Torre stated that he just wanted to render Bryan unconscious, but that he felt something crush in Bryan's neck, and that when he released the hold Bryan was dead.[3] Torre asked Strebendt to provide an alibi, which Stre-

---

[3]The medical examiner testified that although Bryan's hyoid bone (located in the throat) was broken, the break did not cause his death. The

bendt refused to do, although Strebendt did agree to keep Bryan's handgun. Strebendt stored the gun at his home in Oregon.

Strebendt subsequently contacted sheriff's detectives, recounted the conversation with Bryan, and gave them the gun. Strebendt agreed to make recorded telephone calls to Angelina.[4] On December 11, 2003, which was the first time Strebendt had spoken with Angelina in approximately two years, Strebendt told Angelina that "[t]he gun that Rafiel gave me has been recovered," to which Angelina responded that she did not know what Strebendt was talking about and that he had better talk to Torre. On December 12, 2003, during their second conversation, Strebendt told Angelina that Torre had admitted to killing Bryan in self-defense, had given Strebendt Bryan's gun, and had told Strebendt that Angelina would pay $10,000 for someone to kill Bryan. Angelina responded: "That's ridiculous. I would never say that." Angelina did not call the sheriff's department or any other authorities to report the conversation. When questioned by sheriff's deputies the following day, Angelina admitted that she had spoken to Strebendt the previous evening, but said the only matter discussed was whether Torre was home. When asked how Strebendt came to possess Bryan's gun, Angelina said that she did not know.

At trial, Angelina raised a hearsay objection to Strebendt's testimony regarding Torre's statements. The district court made a factual finding that Angelina and Torre were engaged in a conspiracy to murder Bryan, and that Torre's statements

examiner testified that Bryan died of non-ligature manual strangulation, and opined that a choke hold must have been applied to Bryan's neck for several minutes. There were no signs of struggle or marks on Bryan's body consistent with defense wounds.

[4]Strebendt also made recorded telephone calls to Torre, which are not referenced in the district court's FFCL.

as reported by Strebendt thus were admissible as non-hearsay statements of a co-conspirator under Rule 801(d)(2)(E) of the Federal Rules of Evidence.

On December 17, 2003, Torre was arrested and charged with Bryan's murder. Following a jury trial, Torre was convicted of murder in the first degree for killing Bryan with the intent to profit from the policy proceeds.

## B. Angelina's Assertion Of The Fifth Amendment Privilege

Angelina asserted the Fifth Amendment privilege against self-incrimination at Torre's criminal trial and declined to testify. She likewise invoked the privilege during her deposition taken in the instant lawsuit, refusing to answer the following seven questions:

a. "Did you ever express to Rafiel Torre a desire to, quote, get rid of Brian [sic]?"

b. "[D]id you ever tell Rafiel to kill Brian [sic]?"

c. "Prior to Brian's [sic] murder, did you ever tell anybody that you and Rafiel were going to move away together?"

d. "[D]id you have any involvement at all in Brian [sic] Richards' murder?"

e. "Did you ever proposition Rafiel to kill Brian [sic] Richards?"

f. "Did you ever ask Gerald Strebendt to kill Brian [sic] Richards?"

g. "Did you ever ask Rafiel Torre to provide you with an alibi because you had killed Brian [sic] Richards?"

The district court precluded Angelina from testifying at trial as to her involvement, or lack thereof, in Bryan's murder because she had refused to answer questions about this subject during her deposition. Angelina was permitted to testify about all other subjects. The district court also exercised its discretion to draw an adverse inference from Angelina's assertion of the Fifth Amendment privilege against self-incrimination.

## II. STANDARDS OF REVIEW

"A district court's ruling precluding testimony is an evidentiary ruling that is reviewed for abuse of discretion." *United States v. Lynch*, 437 F.3d 902, 913 (9th Cir. 2006) (citing *United States v. Ravel*, 930 F.2d 721, 726 (9th Cir. 1991)). We also review for abuse of discretion a district court's decision to draw an adverse inference from a party's invocation in a civil case of the Fifth Amendment privilege against self-incrimination. *SEC v. Cherif*, 933 F.2d 403, 417 (7th Cir. 1991) (applying abuse of discretion standard); *see also SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) (noting that a district court has discretion whether to draw an adverse inference from the invocation in a civil case of the privilege against self-incrimination).

We review for abuse of discretion a district court's decision to admit deposition testimony under Rule 32(a)(4)(B) of the Federal Rules of Civil Procedure. *See Garcia-Martinez v. City & County of Denver*, 392 F.3d 1187, 1191-92 (10th Cir. 2004). Finally, "[w]e review for an abuse of discretion the district court's decision to admit coconspirators' statements, and review for clear error the district court's underlying factual determinations that a conspiracy existed and that the statements were made in furtherance of that conspiracy." *United States v. Shryock*, 342 F.3d 948, 981 (9th Cir. 2003) (citing *United States v. Bowman*, 215 F.3d 951, 960 (9th Cir. 2000)).

## III.   DISCUSSION

## A.   Preclusion Of Angelina's Testimony

At trial, Angelina attempted to testify that she did not have anything to do with Bryan's murder, but the district court precluded any testimony on this subject on the ground that Angelina had asserted the Fifth Amendment privilege against self-incrimination when asked during her deposition about her involvement in the murder.[5] The district court found expressly that Keith was prejudiced by Angelina's refusal to answer deposition questions about this subject.

[1] Trial courts generally will not permit a party to invoke the privilege against self-incrimination with respect to deposition questions and then later testify about the same subject matter at trial. *See FTC v. Sharp*, 782 F. Supp. 1445, 1452 (D. Nev. 1991). The Federal Rules of Civil Procedure "contemplate . . . 'full and equal discovery' . . . so as to prevent surprise, prejudice and perjury" during trial. *Id*. "[B]ecause the privilege may be initially invoked and later waived at a time when an adverse party can no longer secure the benefits of discovery, the potential for exploitation is apparent." *SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 190 (3d Cir. 1994). The rights of the other litigant must be taken into consideration "when one party invokes the Fifth Amendment during discovery, but on the eve of trial changes his mind and decides to waive the privilege. At that stage, the adverse party — having conducted discovery and prepared the case without the benefit of knowing the content of the privileged matter — would be placed at a disadvantage." *Id*. at 191; *see also Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 577 (1st Cir. 1989) ("A defendant may not use the fifth amendment to shield herself from the opposition's inquiries during discovery only to impale her accusers with surprise testimony at trial."). "The

---

[5]The district court struck Angelina's response when her attorney asked whether she was involved in the planning of Bryan's death.

opportunity to combat the newly available testimony might no longer exist, a new investigation could be required, and orderly trial preparation could be disrupted." *Graystone Nash*, 25 F.3d at 191. " 'Because the privilege is constitutionally based,' " however, "the competing interests of the party asserting the privilege, and the party against whom the privilege is invoked must be carefully balanced," and " 'the detriment to the party asserting it should be no more than is necessary to prevent unfair and unnecessary prejudice to the other side.' " *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1265 (9th Cir. 2000) (quoting *Graystone Nash*, 25 F.3d at 192) (addressing propriety of adverse inference as a consequence of asserting Fifth Amendment privilege during pretrial deposition).

Angelina argues, as she did at trial, that Keith was not prejudiced by her assertion of the privilege at her deposition. She asserts that during the investigation of Bryan's murder, she answered all questions asked by the investigating officers, including questions as to whether she was involved in Bryan's murder, and that she denied any involvement unequivocally. She also contends that Keith knew of those denials, and that her deposition testimony on the subject would not have provided any additional useful information. She further argues that her statements to the officers investigating Bryan's death were sufficient to waive her Fifth Amendment privilege, and that Keith could have filed a motion to compel her to answer deposition questions regarding the issue of her involvement, or lack of involvement, in Bryan's death.

**[2]** Angelina's arguments are not persuasive. Many of the interviews with investigating officers occurred shortly after Bryan's death in December 2001, approximately four years prior to the deposition. During those years, a number of significant events occurred that might have altered Angelina's testimony and certainly would have been proper subjects for inquiry during the deposition. Most significantly, Torre was arrested and convicted of Bryan's murder, and Strebendt's

statements describing the conspiracy between Torre and Angelina came to light. Angelina was not questioned about these events in any proceeding, as she did not testify at Torre's criminal trial and declined to answer questions regarding her alleged involvement in the murder during her deposition in the instant case. Under these circumstances, we conclude that the district court's finding of prejudice was warranted.

[3] Moreover, Angelina's statements to investigating officers in the days following Bryan's death did not waive her privilege against self-incrimination with respect to the later criminal proceeding against Torre or with respect to the instant civil proceeding. *See United States v. Licavoli*, 604 F.2d 613, 623 (9th Cir. 1979) (holding that voluntary testimony before a grand jury did not waive the privilege at trial, because "[i]t is settled that a waiver of the Fifth Amendment privilege is limited to the particular proceeding in which the waiver occurs") ; *see also McCarthy v. Arndstein*, 262 U.S. 355, 357—59 (1923) (holding that when a witness's previous disclosure is not an actual admission of guilt or incriminating facts, the witness subsequently may assert the privilege and decline to testify as to matters that might incriminate him).

[4] Notably, the district court precluded Angelina from testifying only as to the subject as to which she asserted the Fifth Amendment privilege, that is, her involvement (or lack thereof) in Bryan's murder. The court's order was narrowly tailored to impose upon Angelina only that detriment necessary to prevent unfair prejudice to Keith. Accordingly, the order did not constitute an abuse of discretion.

[5] Even if we were to find that the district court did err in precluding a portion of Angelina's testimony, any such error was harmless. When reviewing the effect of an evidentiary ruling in a civil case, we presume prejudice absent a showing that it is more probable than not that the same verdict would have been reached without the erroneous ruling. *Obrey v.*

*Johnson*, 400 F.3d 691, 701 (9th Cir. 2005) (citing *Haddad v. Lockheed Cal. Corp.*, 720 F.2d 1454, 1459 (9th Cir. 1983)). Here, the district court made an explicit adverse credibility finding with respect to Angelina's assertion that she did not know the amount of the policy's death benefit, and noted several instances in which Angelina's testimony conflicted with other evidence. The court also cited to more than a dozen facts in support of its determination that Angelina was involved in Bryan's murder. Based upon this record, we conclude that it is more probable than not that the district court would have reached the same verdict even if Angelina had testified.

## B. Adverse Inference

**[6]** In addition to precluding Angelina from testifying with respect to her involvement in Bryan's murder, the district court drew an adverse inference from Angelina's assertion of the Fifth Amendment as to this subject. When a party asserts the privilege against self-incrimination in a civil case, the district court has discretion to draw an adverse inference from such assertion. *See Glanzer*, 232 F.3d at 1264 (citing *Colello*, 139 F.3d at 677). A decision not to draw the inference " 'poses substantial problems for an adverse party who is deprived of a source of information that might conceivably be determinative in a search for the truth.' " *Id.* (quoting *Graystone Nash*, 25 F.3d at 190). However, "under certain circumstances . . . an adverse inference from an assertion of one's privilege not to reveal information is too high a price to pay." *Id.* at 1265. "The tension between one party's Fifth Amendment rights and the other party's right to a fair proceeding is resolved by analyzing each instance where the adverse inference was drawn, or not drawn, on a case-by-case basis under the microscope of the circumstances of that particular civil litigation." *Id.* (citing *Graystone Nash*, 25 F.3d at 192). The inference may not be drawn "unless there is a substantial need for the information and there is not another less burdensome way of obtaining that information." *Id.* (citing *Serafino v.*

*Hasbro, Inc.*, 82 F.3d 515, 518-19 (1st Cir. 1996). The district court must determine "whether the value of presenting [the] evidence [is] substantially outweighed by the danger of unfair prejudice" to the party asserting the privilege. *Id.* at 1266 (citing Fed. R. Evid. 403; *Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983)). Moreover, the inference may be drawn only when there is independent evidence of the fact about which the party refuses to testify. *Id.* at 1264.

Angelina argues that there was no substantial need for her deposition testimony as to her involvement in Bryan's murder; that in any event she offered trial testimony on this subject; that there is no independent evidence of her involvement in the murder; and that the adverse inference constituted a double penalty for her legitimate assertion of her privilege against self-incrimination, because she already was precluded from testifying as to her alleged involvement.

**[7]** The district court found explicitly that there was a substantial need for Angelina's testimony with respect to the deposition questions she refused to answer, because those questions went to the central question in this case, which was whether Angelina asked Torre to murder Bryan or had any other involvement in his death. As discussed previously, Angelina asserts that she told investigators that she had no involvement in Bryan's death, and that obviously she would have said the same thing had she testified. Angelina argues that under these circumstances Keith was not deprived of any information necessary to litigate this case. Angelina's argument ignores the fact that the deposition questions at issue went beyond a simple, "did you conspire to kill your husband?" For example, one question asked whether before the murder Angelina told others that she and Torre were going to move away together. Another asked whether Angelina ever told Torre that she wanted to be rid of Bryan. The responses to these questions are not apparent from the record, and in fact there are conflicts in the evidence as to the status of Angeli-

na's relationships with Bryan and with Torre. Keith was entitled to pursue these avenues of inquiry.

With respect to Angelina's offer of trial testimony on these subjects, the district court was within its discretion to preclude such testimony on the ground of prejudice to Keith, as discussed above. Although Angelina had offered bare denials of her involvement during the investigation of Bryan's 2001 murder, by the time of her 2005 deposition a number of significant new facts had come to light, including Torre's criminal conviction for the murder and Strebendt's statements regarding Angelina's involvement.

With respect to the requirement of independent evidence of Angelina's involvement in the murder, the district court's FFCL list numerous facts and pieces of evidence, in addition to Strebendt's testimony, in support of the court's finding that Angelina conspired in, aided, and abetted Bryan's murder: (1) that Bryan possessed a policy with a one million dollar death benefit; (2) Angelina's knowledge of the death benefit; (3) Angelina's affair with Torre; (4) that Angelina and Torre leased a commercial building together without Bryan's knowledge or participation; (5) Angelina's knowledge that her marriage might end in divorce; (6) evidence that Torre murdered Bryan; (7) that Angelina and Torre initially concealed their affair from the detectives investigating Bryan's death; (8) Angelina's misrepresentations to sheriff's detectives regarding her knowledge of the policy; (9) Angelina's query to Beh within days after Bryan's murder as to the amount of the death benefit; (10) that Angelina's affair with Torre continued after Bryan's murder; (11) that Angelina purchased the Cancun vacation package for herself and Torre six days after receiving the $50,000 advance on the policy benefits; (12) Angelina's lies to sheriff's detectives regarding her December 2003 conversations with Strebendt; and (13) the adverse inference drawn from Angelina's invocation of the Fifth Amendment right against self-incrimination. This direct

and circumstantial evidence satisfies the requirement of independent evidence of Angelina's involvement in the murder.

**[8]** Angelina argues that the district court failed to consider evidence that she was not involved in the murder, citing to the transcript of a telephone call Strebendt made to Torre at the behest of investigating officials. In that call, Torre unequivocally denied that Angelina wanted Bryan killed or knew about Torre's involvement. It is true that the district court did not address this particular piece of evidence. However, it did address at length other evidence and arguments made by Angelina. For example, it addressed Angelina's argument that Bryan had purchased expensive gifts for her and paid for her plastic surgery, and that this conduct was inconsistent with the theory that he was contemplating divorce. It also noted Angelina's contention that Torre, as Angelina's lover, obviously would have been a prime suspect in Bryan's murder, and that to contend that she would have conspired with Torre under those circumstances is to impute to her an improbable degree of stupidity. The district court clearly considered the record as a whole, and found that the totality of the evidence supported a conclusion that Angelina was involved in Bryan's murder. Reaching such a conclusion on this record was not an abuse of discretion.

**[9]** Angelina claims that she was subjected to a double penalty for a legitimate exercise of her Fifth Amendment privilege, first by being precluded from testifying at trial that she did *not* have anything to do with Bryan's murder, and then by an adverse inference that she *did* participate in Bryan's murder because of her lack of testimony as to this point. While Angelina's "piling on" argument has some appeal, we conclude that given the state of the evidence the district court did not abuse its discretion in imposing both sanctions. As is discussed above, the district court was well within its discretion to exclude Angelina's testimony as to her involvement, or lack thereof, in Bryan's murder. Faced with an absence of any testimony from Angelina on the central issue in the case, the

district court was entitled to draw the adverse inference. The court observed appropriately that because the case was tried to the court rather than a jury, there was no danger that the adverse inference would be given undue weight.

[10] We caution that what Angelina characterizes as a "double penalty" may be too extreme a sanction in some cases, and that district courts should be hesitant to impose it absent compelling circumstances. That said, we cannot say that the district court in this case abused its discretion. The district court's decision was thoroughly and carefully reasoned. The adverse inference was only one of fourteen facts listed by the district court in support of its conclusion that Angelina conspired in, aided, and abetted Bryan's murder. More probably than not, the court would have reached the same verdict even absent the inference.

## C. Strebendt As An Unavailable Witness

The district court admitted Strebendt's deposition testimony on the ground that he resided in Oregon and thus was unavailable for trial. Under Rule 32(a)(4)(B) of the Federal Rules of Civil Procedure (formerly Rule 32(a)(3)(B)), a party may use the deposition of a witness at a hearing or trial if the court finds "that the witness is more than 100 miles from the place of hearing or trial." Fed. R. Civ. P. 32(a)(4)(B).

[11] Angelina asserted at trial, and argues again here, that Strebendt in fact resided in Los Angeles and thus was not subject to Rule 32(a)(4)(B). Angelina's argument at trial relied upon a July 2006 posting on a martial arts website. The posting provided background on Strebendt and indicated that his "Home City" was "Los Angeles, CA." The district court characterized the website posting as an "unauthenticated and ambiguous statement," and concluded that it was insufficient to demonstrate that Strebendt resided in California given the evidence to the contrary. The court noted that Strebendt testified at his deposition that he lives in Oregon; that Keith had

filed a witness list identifying Strebendt's residence as Eugene, Oregon; and that Keith's counsel had telephoned the Oregon telephone number provided by Strebendt and spoken with him at that number. Based upon this record, the district court did not abuse its discretion in admitting Strebendt's deposition testimony under Rule 32(a)(4)(B).

Angelina argues that the district court also abused its discretion in admitting Strebendt's testimony under Rule 804(b)(1) of the Federal Rules of Evidence. However, because Strebendt's testimony properly was admitted under Rule 32(a)(4)(B), it need not also meet the requirements for admissibility set forth in Rule 804(b)(1). Under Rule 802, hearsay is admissible where allowed by the Federal Rules of Evidence, or "by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress." Fed. R. Evid. 802. Rule 32(a)(4)(B) is one of these "other rules." *See* Fed. R. Evid. 802 advisory committee's note (identifying Rule 32 as one of the "other rules"); Fed. R. Civ. P. 32 advisory committee's note (explaining that new Rule 32(a) was intended to "eliminate[ ] the possibility of certain technical hearsay objections which are based, not on the contents of deponent's testimony, but on his absence from court"). Our sister circuits have recognized that Rule 32(a) is an independent exception to the hearsay rule. *See Ueland v. United States*, 291 F.3d 993, 996 (7th Cir. 2002) ("Rule 32(a), as a freestanding exception to the hearsay rule, is one of the 'other rules' to which Fed. R. Evid. 802 refers. Evidence authorized by Rule 32(a) cannot be excluded as hearsay, unless it would be inadmissible even if delivered in court."); *Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 962-63 (10th Cir. 1993) ("Deposition testimony is normally inadmissible hearsay, but Fed. R. Civ. P. 32(a) creates an exception to the hearsay rules."); *S. Indiana Broadcasting, Ltd. v. FCC*, 935 F.2d 1340, 1341—42 (D.C. Cir. 1991) (recognizing that Fed. R. Civ. P. 32(a) creates an exception to the hearsay rule); *United States v. Vespe*, 868 F.2d 1328, 1339 (3d Cir. 1989) (Rule 32(a)(3)(B) "constitutes an independent exception to the hear-

say rule"); *Carey v. Bahama Cruise Lines*, 864 F.2d 201, 204 & n.2 (1st Cir. 1988) (explaining that Rule 32(a)(3)(B) "is more permissive than Federal Rule of Evidence 804(a)(5)"). Because the district court did not abuse its discretion in admitting Strebendt's deposition testimony under Rule 32(a)(4)(B), Rule 804 is irrelevant to our analysis.

## D. Strebendt's Testimony Regarding Torre's Statements

Angelina also raised a hearsay objection to the admission of Strebendt's testimony regarding Torre's statements. The district court made a factual finding that Angelina and Torre were engaged in a conspiracy to murder Bryan, and that as a result Torre's statements as reported by Strebendt were admissible as non-hearsay statements of a co-conspirator under Rule 801(d)(2)(E) of the Federal Rules of Evidence. That rule provides in relevant part that a statement is not hearsay if it is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). The proponent of the statement must demonstrate by a preponderance of the evidence the existence of, and participation in, the conspiracy. *United States v. Peralta*, 941 F.2d 1003, 1005 (9th Cir. 1991) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)).

**[12]** Angelina argues that there was insufficient evidence in the record to support a finding that she and Torre were engaged in a conspiracy to murder Bryan, and that the district court failed to consider evidence in her favor as to this point. This argument is identical to that addressed above with respect to the district court's decision to draw an adverse inference. It is apparent from the FFCL that the district court considered the record as a whole and made a factual determination that Angelina did conspire with Torre to kill Bryan. As discussed previously, the district court identified more than a dozen specific facts upon which it relied in reaching this conclusion. The conclusion is not clearly erroneous. It is apparent that, assuming a conspiracy between Angelina and Torre, the

subject statements were made in the course of and in further-ance of the conspiracy. Accordingly, the district court did not abuse its discretion in admitting the subject statements under Rule 801(d)(2)(E).

## IV.   CONCLUSION

We conclude that the district court did not abuse its discretion in precluding Angelina from testifying that she was not involved in Bryan's murder, or in drawing an adverse inference from her assertion of the Fifth Amendment privilege against self-incrimination, and that any error in these rulings was harmless. We also conclude that the district court properly admitted Strebendt's deposition testimony.

**AFFIRMED.**