NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

OCT 25 2018

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | No. 17-55849 |
| Plaintiff-Appellee, | D.C. No. 8:16-cv-00974-CJC-AGR |
| v. | |
| CHARLES C. LIU, XIN WANG a/k/a LISA WANG, | MEMORANDUM* |
| Defendants-Appellants, | |
| and | |
| PACIFIC PROTON THERAPY REGIONAL CENTER LLC; et al., | |
| Defendants. | |

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted October 11, 2018
Pasadena, California

Before: WATFORD and OWENS, Circuit Judges, and PRESNELL,** District Judge.

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

\*\* The Honorable Gregory A. Presnell, United States District Judge for the Middle District of Florida, sitting by designation.

Charles Liu ("Liu") and his wife, Xin Wang ("Wang"), appeal the district court's entry of summary judgment in favor of the SEC, finding that the couple violated Section 17(a)(2) of the Securities Act of 1933. Liu and Wang raised approximately $27 million from Chinese investors under the EB-5 Immigrant Investor Program (the "EB-5 Program"), which is administered by United States Citizenship and Immigration Services and which allows foreign citizens to obtain visas in exchange for investments in job-creating projects in the United States.

The Appellants' project involved selling membership interests in an LLC, which would then lend the proceeds of those sales to a second LLC; the second LLC was supposed to use the lent funds to construct and operate a cancer treatment center in California. Each investor was required to put up a $500,000 "Capital Contribution" and a $45,000 "Administrative Fee." According to the Private Offering Memorandum (henceforth, the "POM") provided to investors, the Capital Contribution would be used for construction costs, equipment purchases, and other items needed to build and operate the cancer treatment center, while the Administrative Fee would be used to pay "legal, accounting and administration expenses" related to the offering. Moreover, "[o]ffering expenses, commissions, and fees incurred in connection with [the] [o]ffering" would be paid only from the Administrative Fee, not from the Capital Contribution. The district court found that the Appellants misappropriated most of the money raised, paying $12.9

million to marketing firms to solicit new investors, and paying themselves approximately $8.2 million in salaries, although there was no mention of such exorbitant salaries in the POM.[1]  Despite these expenditures, the Appellants never even obtained the required permits to break ground for the cancer center.

In granting summary judgment, the district court ordered disgorgement of the entire amount that had been raised from investors, imposed civil penalties equal to the $8.2 million the Appellants had personally received from the project, and permanently enjoined the Appellants from future solicitation of EB-5 Program investors.

We have jurisdiction under 28 U.S.C. § 1291.  A grant of summary judgment is reviewed *de novo*.  *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1124 (9th Cir. 2002).  We affirm.

The Appellants seek reversal of the summary judgment order on numerous grounds.  They first contend that the limited-partnership interests they sold were not "securities" within the meaning of Section 17(a)(2)[2] because the investors

---

[1]    As set forth in the POM, the manager of the first LLC was entitled to a management fee of 3 percent of the funds raised, or approximately $800,000 in total.

[2]    Section 17(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77q(a)(2), makes it unlawful for any person in the offer or sale of any "securities" to obtain "money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

were primarily interested in obtaining visas, not profits. Section 2(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77b(a)(1), defines the term "security" to include, inter alia, "investment contracts." The basic test for distinguishing transactions involving investment contracts from other commercial dealings is "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 (1975) (quoting *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946)).

Even if it was not their primary motivation, the investors here were promised a chance to earn a profit. The POM provided that if the cancer center project succeeded, after five years the second LLC would repay its loan with interest "at the rate of 0.25% per annum," and these funds would be distributed to investors. This promise is enough to establish that investors had some expectation of receiving profits, as required under *Forman*.[3] In addition, Liu hired American securities lawyers to draft the POM under his supervision, and that document repeatedly refers to the investments at issue as "securities." For example, the first page of the POM refers to them by that term five times. *See Forman*, 421 U.S. at

---

[3] Counsel for the Appellants also argued that the investments were not securities because the potential rate of return was lower than the expected rate of inflation. The Appellants do not cite any authority requiring that an investment's potential return exceed projected inflation rates. Such a standard would be unworkable and is not required by *Forman*.

850-51 ("There may be occasions when the use of a traditional name such as 'stocks' or 'bonds' will lead a purchaser justifiably to assume that the federal securities laws apply.").

The Appellants' second complaint is that the district court improperly drew adverse inferences based on the assertion of their Fifth Amendment rights during their depositions. A district court's decision to draw an adverse inference from a party's invocation in a civil case of the Fifth Amendment privilege against self-incrimination is reviewed for abuse of discretion. *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 909 (9th Cir. 2008).

Appellants complain of two such inferences: an inference that they controlled a marketing firm that was paid $3.8 million and only brought in 10 investors, and an inference that the Appellants acted with a high degree of scienter, justifying a permanent injunction against future solicitation of EB-5 Program investors. *See Aaron v. Securities and Exchange Commission*, 446 U.S. 680, 701 (1980) (holding that degree of intentional wrongdoing evident in a defendant's past conduct is an "important factor" to consider when SEC seeks permanent injunction). Courts have discretion to draw adverse inferences based on the assertion of a Fifth Amendment privilege in a civil case, so long as there is a substantial need for the information, there is not another less burdensome way of

obtaining that information, and there is corroborating evidence to support the fact under inquiry. *Richards*, 541 F.3d at 912.

The district court did not rely on the inference regarding control of the marketing firm to support any conclusion in its summary judgment order. Thus, even assuming *arguendo* that the district court erred in drawing that inference, the error was harmless. As for the inference regarding scienter, the district court needed that information to determine whether an injunction was warranted, and the Appellants do not point to any other source from which the district court could have obtained it. The inference was corroborated by several items of evidence tending to show that, among other things, the Appellants organized and controlled the project and that, at its outset, they entered contracts with marketers that would require payments in excess of the sums raised by way of the Administrative Fee, thereby violating the promises of the POM. In addition, the district court noted that the $8.2 million the Appellants paid themselves was far in excess of the $2.2 million raised in Administration Fees, thereby necessarily putting in their own pockets money that should only have been spent to construct and operate the cancer center. The district court did not abuse its discretion in drawing the inference that the Appellants acted with scienter.

The Appellants also argue that American securities laws do not apply to their actions because there is no evidence that they made sales or offers to sell

6

within the United States. However, the Appellants did not raise this extraterritoriality argument before the district court, and it has therefore been waived. *See, e.g., In re Mercury Interactive Corp. Sec. Litig*, 618 F.3d 988, 992 (9th Cir. 2010) ("Although no bright line rule exists to determine whether a matter has been properly raised below, an issue will generally be deemed waived on appeal if the argument was not raised sufficiently for the trial court to rule on it.") (internal quotations omitted).

Finally, the Appellants contend that the district court's order that they disgorge $26,733,018.81 – the total amount they raised from their investors ($26,967,918) less the amount left over and available to be returned ($234,899.19) – was erroneous. The court reviews a district court's imposition of equitable remedies, including injunctive relief, disgorgement, and penalties, for abuse of discretion. *SEC v. Goldfield Deep Mines Co.*, 758 F.2d 459, 465 (9th Cir. 1985); *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1113 (9th Cir. 2006).

Relying on *Kokesh v. SEC*, 137 S.Ct. 1635 (2017), the Appellants argue that the district court lacked the power to order disgorgement in this amount. But *Kokesh* expressly refused to reach this issue, *id.* at 1642 n.3, so that case is not "clearly irreconcilable" with our longstanding precedent on this subject. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). They also contend that, in setting the amount to be disgorged, the district court did not give them credit for

7

amounts they characterize as legitimate business expenses, such as rent payments and deposits paid to equipment manufacturers. But the proper amount of disgorgement in a scheme such as this one is the entire amount raised less the money paid back to the investors. *JT Wallenbrock & Assocs.*, 440 F.3d at 1114 (stating that it would be "unjust to permit the defendants to offset against the investor dollars they received the expenses of running the very business they created to defraud those investors into giving the defendants the money in the first place").[4]

The district court also imposed civil penalties equal to the undisputed amounts each of the Appellants directly received from the project – $6,714,580 for Liu and $1,538,000 for Wang. As with the disgorgement order, the Appellants argue that their "legitimate business expenses" should have been deducted from these amounts. The Securities Act provides that violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and that "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons" may be punished by

---

[4] To justify setting this disgorgement amount, the district court noted that the contracts with the overseas marketers and a significant portion of Liu's compensation – both of which would necessarily require tapping into the funds set aside for construction and operation of the cancer center – were set at the inception of the project; the district court described this as "extensive evidence of a thorough, long-standing scheme to defraud investors."

imposition of penalties up to "the gross amount of pecuniary gain" to each defendant.  15 U.S.C. § 77t(d)(2)(C).  The Appellants do not challenge the district court's characterization of their violations as meeting both of these requirements, and we find no abuse of discretion by the district court in imposing civil penalties equal to the undisputed amount of each defendant's gross pecuniary gain.

**AFFIRMED.**