Jane DOE, Plaintiff,

v.

CITY OF SAN DIEGO,
et al., Defendants.

Case No. 12–cv–689–MMA–DHB.

United States District Court,
S.D. California.

Signed March 17, 2014.

Browne Greene, Greene, Broillet & Wheeler LLP, Santa Monica, CA, Linda G. Workman, Joseph Gary Dicks, Dicks and Workman APC, San Diego, CA, Andrew J. Spielberger, Daniel K. Balaban, Balaban & Spielberger, LLP, Los Angeles, CA, Holly N. Boyer, Esner, Chang & Boyer, Pasadena, CA, for Plaintiff.

Christina M. Milligan, Donald F. Shanahan, Keith W. Phillips, Office of the City Attorney, Michelle Landis Gearhart, Daley & Heft LLP, San Diego, CA, Mitchell D. Dean, Daley and Heft, Solana Beach, CA, Kevin M. Osterberg, Haight Brown and Bonesteel LLP, Riverside, CA, for Defendants.

## ORDER GRANTING PLAINTIFF JANE DOE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

[Doc. No. 202]

MICHAEL M. ANELLO, District Judge.

This case arises out of the alleged predatory sexual behavior of former San Diego Police Officer Anthony Arevalos. Plaintiff Jane Doe ("Plaintiff" or "Doe") was one of

Arevalos' many victims. Plaintiff filed suit against Defendants City of San Diego (the "City"), Arevalos, and nine of Arevalos' past supervisors in the San Diego Police Department. In the present motion, Plaintiff seeks to hold the City vicariously liable for Arevalos' tortious conduct. In addition, Plaintiff seeks summary judgment against the City on her claims of sexual assault and battery. Upon consideration of the comprehensive record before the Court, including the written and oral arguments of counsel, the Court **GRANTS** Plaintiff's motion for partial summary judgment.

### Factual Background [1]

On March 8, 2011, Plaintiff Jane Doe attended a Mardi Gras event in the downtown area of San Diego. At approximately 10:45 p.m., Doe left the event in anticipation of her night shift at a youth center. While proceeding out of downtown, Doe was pulled over by on-duty San Diego Police Department Officer Anthony Arevalos for failing to use a turn signal. Officer Arevalos used his lights and loudspeaker to effectuate his stop of Plaintiff. Arevalos asked Doe if she had been drinking alcohol; Doe acknowledged doing so earlier in the evening. Arevalos then asked if Doe was willing to perform a field sobriety test or a preliminary alcohol screen ("PAS") test, administered using a handheld device denoting alcohol level. Doe agreed to perform the PAS test. The test indicated that her blood alcohol content ("BAC") was .09. Doe then agreed to perform another breath test using the intoxilyzer machine located in the trunk of Arevalos' police car. The second and third tests recorded that Doe's BAC registered at .08 and .09.

After representing that Doe had failed the alcohol breathalyzer tests, Arevalos told Doe they might be able to "work something out" in order for her to avoid being arrested for driving under the influence. Arevalos asked Doe what her "ideal situation would be," and she responded to have someone pick her up. Arevalos ignored her request. Because they had been at the roadside location for "too long," Arevalos instructed Plaintiff to drive to a nearby 7–Eleven. Arevalos followed her in his patrol car. She parked in front of the 7–Eleven and Arevalos parked his patrol car next to her car, effectively blocking her in.

Arevalos came up to Doe's car window and asked Doe what she would be willing to do to get out of a DUI arrest. Doe did not suggest anything because she did not want to put any ideas in his head. Arevalos suggested that she give him her bra and panties. Doe was hesitant to give her bra, but would "if that's what he wanted." Arevalos said her panties would suffice. He gave Doe the option to take her panties off either in the car or inside the 7–Eleven bathroom. Not wanting to undress in front of Arevalos, Doe chose the bathroom.

Doe and Arevalos entered the 7–Eleven together. After retrieving the bathroom key, Arevalos opened the bathroom door, and Doe entered. To Doe's astonishment, Arevalos followed Doe into the single stall bathroom; shut the door; and positioned himself between Doe and the door. Doe then took off her pants and panties and handed the panties to Arevalos. Arevalos told Doe he wanted to see her breasts, and she pulled up her shirt and bra and exposed her breasts.

---

1. The following facts are not reasonably in dispute, except where otherwise noted. Disputed material facts are discussed in detail when relevant to the Court's analysis below. The facts are taken from Plaintiff's moving papers and Defendant's opposition, and construed in the light most favorable to Defendant. *Horphag Research Ltd. v. Garcia,* 475 F.3d 1029, 1035 (9th Cir.2007).

The parties disagree as to what occurred next. Doe alleges that Arevalos put his arm around her, pulled her against his shoulder, and started to rub her vagina. The City disputes that an intimate touching occurred.[2]

After Doe and Arevalos left the bathroom, Doe took another breathalyzer test that allegedly registered .07. Arevalos told Plaintiff he would contact her to let her know when all the paperwork was gone and she was "safe." Arevalos then released Plaintiff and allowed her to drive to her job at the youth center. After Plaintiff arrived at work, Arevalos sent her a text message stating that he would contact her at the end of the month.

While at work, Plaintiff called San Diego Police Department Officer Kelly Besker regarding the sexual misconduct;[3] Besker instructed Plaintiff to call the Department's main number. Plaintiff called the number, and a sex crimes team was dispatched to meet with Plaintiff. Detective Lori Adams asked Plaintiff to participate in two pretext calls with Arevalos. Plaintiff agreed. These calls occurred on March 10, 2011, and were both recorded.

***The First Pretext Call*** [4]

The conversation in the first pretext call included the following exchanges between Arevalos and Doe:

Doe: Hey Anthony, I'm just ... I don't know, I haven't been able to sleep.

I've been freaking out, like I'm just ... stressed ... I don't know [if] you're still gonna turn me in or if you still have paperwork on me.

Arevalos: Okay, now listen ... I made the executive decision that night, it's like okay. I am not gonna do this girl, I'm not gonna screw her career. She has too much education.... Now, unless I turn the paperwork in to the District Attorney's Office, then this thing's never gonna happen, okay? You have to trust me on this as much as I trust you, okay? I mean I want you to believe in me because I believe in ... you as a person that you shouldn't have been behind that wheel that night. I mean do ... you understand that that, you get that?

Doe: ... I was just a little scared 'cause you know you gave me the panties back and you said you wanted them and I just didn't know what that meant.

Arevalos: No, ... I'm not gonna take anything of value from you.... I just want to ... I want you to be comfortable that I made the decision that night, you know to ... not make the arrest. I mean that's that. I mean I can make the decisions, and I call that out there in the field.

[...]

Doe: I just keep thinking like the next time I drive I'm gonna get ... some-

---

**2.** In a separate motion before the Court the City appears to make a judicial admission that a touching occurred. [*See* Doc. No. 201 at Fact No. 18 ("Once Doe was in the 7–11 bathroom, she took off her panties and handed them to Arevalos. Arevalos then reached out and briefly touched her vagina. Doe said "no" and Arevalos immediately withdrew his hand.").] At the summary judgment hearing the City's counsel contended that this factual statement was couched in terms of Plaintiff's "allegations." It is not. Nonetheless, upon consideration of the City's contentions throughout the entirety of the voluminous record before the Court, the Court will not consider the City's statement a judicial admission.

**3.** Jane Doe's boyfriend referred her to Officer Besker, an acquaintance he met working downtown.

**4.** The City's objection to the admissibility of the pretext calls, discussed in further detail below, is overruled.

ones gonna (unintelligible) ... DUI [laughing] on my record.

Arevalos: Yeah. Exactly! The next time you register your plates or something. You know I ... I understand what you're saying. Okay, the only way that's gonna happen is if you know like I said you know the third week of March, whatever it is, that you know the computer report comes out and then they're just ... basically on mass, (unintelligible) 'What happened to this?' But that's why ... I've been doing this for 18 years you know, so ... I know what I'm doing out there. I know what it takes to make the arrests, and I hold the paperwork in my hand and nobody can tell me to hand it in, it's up to me to hand it in. If I don't hand it in then nobody knows about it.... And there's no ... you know there's no computer input, there's no record, there's nothing.

Doe: Okay, I just ... I just feel like, I don't know, like I didn't do my part 'cause you gave the panties back.

Arevalos: [Laughing] Do you want ... Do you ah ... Um ... I want you to be alright with everything. I want you to be comfortable with everything, you know? You know it's hard for me to explain things over the phone, ah ... to show you and tell you how this thing goes down, the process works, it was very difficult. You know I mean ... I mean ... it's up to you, do you want to wait until ... if you want to wait until the third week to meet with coffee, that's fine. You want to meet there. If you want a talk earlier than that, I can explain some things to you, that's your call.

[...]

Arevalos: Listen to me. Listen to me. This has to be ... this has to be between you and I, you understand that, right?

Doe: No, defi ... I don't want anyone to know what happened at all. I ... No. No.

[...]

Doe: I don't know, I guess I'm just that ... that ... nervous that it's like ... I don't know 'cause you had said that the deal was you know ...

Arevalos: Right. Right.

Doe: ... for the panties. And then you gave 'em back, so I just ... I don't ... I just wanta make sure the deal's still on even though you gave them back.

Arevalos: Still on. Okay?

Doe: Thank you so much. Thank you.

[...]

Doe: Oh, no, I just ... I just ... I don't know, I'm still kind of ... I'm just trying to calm down and I just ...

Arevalos: May I ... I'm gonna ... I'm gonna tell you some things later on tonight that's gonna make you very very calm. Just relax, okay? Please relax, okay? If I would have been some asshole cop, some rookie cop, you would have already been arrested and this law would have been going a whole different way, you would have been screwed.

[Doc. No. 202–19.]

### The Second Pretext Call

Doe: I would just ... feel better if I knew that ... I guess, I don't know, I just ... Um ... just kind of talk ... me down I guess.... I mean cause you gave the panties back, and then like you had said you wanted to touch me and then you stopped, and so I don't know if you were upset or you didn't seem pleased 'cause you just step ... I don't know. I just want to

make sure ... that what I did was enough.

Arevalos: ... Let me ask you this. Do you ... I mean, what if I say no? ... That's what I want to know.

Doe: ... What more would you want, I guess?

Arevalos: Well, what is your ... thinking? You told me that you know, 'Yeah, I wanted to touch you, but then I stopped.' I mean how ... I mean what do you think ... would have been adequate?

Doe: I don't know. I mean I ... that's what I'm ... that's way I'm [laughing] asking you, I don't know what it takes to ...

Arevalos: Right. Right.

Doe: ... get out of the DUI. I mean you're the ... the cop, I don't know.

Arevalos: Okay. Listen to me ... listen to me right now, okay? [...] All I want to do is make you feel good that I have made the decision in my heart and I [have] made the decision on paper that you were not worth going to jail for period.... I honestly truly believe that you thought you were way under the legal limit. Okay, because when you first blew into the PAS device, you were shocked about the reading, okay?

[...]

I thought you were a very honest person.... [S]o right away in my head I'm thinking okay, I don't' want to screw this girl over. If I arrest her, she ... I mean she's gonna lose a lot of what she's been training for. She's gonna lose a lot of what she's going to school for. She'll lose more than what she's gonna gain, period! Okay? So I figured I want her to feel satisfied that she gave me something to make me feel good, so I can just make this ... this paperwork and stuff go away. Yeah, would ... I have liked to have been there longer with you, of course I would have liked to been there longer with you but you know I'm in uniform. You know I mean I'm on the job, it's like it's hard for me to ... to be comfortable around you.

[...]

Doe: Okay. It just seemed like that you got mad or upset when you stopped touching me.

Arevalos: No ... no ... no ... no, not at all, don't ... don't ... I don't want you to think that. There's no ill will in my mind whatsoever right now .... I'm just trying to put you at ease that when I do see you again in person, I want you to know that it's gonna be a good meeting .... And it's gonna be a meeting where I'm gonna say, guess what, everything is totally erased, totally done. There's no ... there's no existence of paperwork. There's no existence of anything that said I even ever stopped you, okay?

[...]

Doe: Okay, ... I just want to make sure that ... it's just hard to trust people you know, ah ...

Arevalos: ... I totally hear you because if ... I know because ... if I was to submit paperwork, you'd be screwed because ... not in life in general, but I mean your job, your career, your schooling. [...] So I want you to be comfortable. I want you to relax. I'm not gonna stab you in the back. I say you know what, fuck this girl, I'm gonna put the paperwork through. You have to trust me. Please trust. If nobody else, just trust me, please.

[...]

Doe: I was just surprised that you stopped before I orgasmed, I just figured that's what you wanted.

Arevalos: ... I definitely wanted you to feel good, I definitely wanted that. I just didn't think you had enough time because you were in a rush, you were on the way out.... Yeah, that would have been ideal. You know it would have been perfect, would have been cool. But just because that did not happen ... just because it was just timing. I mean I was trying to get you to work as soon as possible as well.

Doe: Yeah.... I mean yeah, did it ... did you like it though, I mean I don't ... I just feel like you didn't like what you were doing to me.

Arevalos: You know what, how come ... I did. I ... I ... I absolutely did. Well like I said, would I have liked it longer, of course! Of course 'cause I wanted you to ... to be relaxed during it, and I ... I didn't feel you at all relaxed during it, so I ... I was like, okay, you know what, let me just stop right now, in my mind, let me just stop right now and then we'll just go forward from here. So I mean I made that decision also. It's just ... I mean I want you to be comfortable right now that I'm ... I'm not gonna stab you in the back.

[...]

Arevalos: I wanted ... I wanted you to feel good.

Doe: I did. I just, you know you're a cop, it's intimidating, it's a little overwhelming.

Arevalos: Ah, no ... I know that.

Doe: And then it's crazy that I was standing there with no panties on.

Arevalos: [Laughing] You are a grown woman. You really are. You're ... you handled it very well ... very well.

[...]

Doe: [Y]ou said you liked my boobs before I lifted 'em up, but you didn't say anything afterwards. Did they look okay?

Arevalos: Well I didn't want ... Absolutely girl! Are you kidding me? I mean it .... it's hard for me 'cause here's another thing too you know, I thought you were a very beautiful woman and I wanted to please you in every way, okay, every way.

[...]

Doe: So ah, what did you like better, my boobs or my ah ... the V-jay jay?

Arevalos: [Snickering] To tell you the truth I like the whole (unintelligible), your whole package, your whole personality, your package, every ... everything together, very nice.

Doe: Oh, come on! Guys are always one thing or the other. Boobs, ass [...] vagina, one of the things, so what's your favorite, which was your favorite?

Arevalos: [Laughing] Let's just say ah ... well, I tell you what, your vagina was very nice, put it that way.

Doe: Cool, well I'm glad you thought so.

Arevalos: Very ... very very nice.

Doe: What did you like best?

Arevalos: I was actually ... Um ... you know what I liked the best is when the shirt came up and the pants went down. I didn't ... expect your body to be as nice and wonderful as it was.

Doe: Did that turn you on? Did you like it?

Arevalos: Yes. You don't even know how much, very much so. Doe: Which part the most?

Arevalos: The (unintelligible) ... the instant moment that I touched you, the skin texture, the temperature, the

way it felt, everything was like perfect.

Doe: My vagina, right, when you touched that?

Arevalos: I mean I ... What do you want me to tell you? What do you want me to say to you?

Doe: I ... I just want to feel that you actually ... that you got what you wanted. That you ... that I was enough. That ... you appreciated me, that ... my body was good enough.

Arevalos: Oh your body's wonderful! Your body was amazing, are you kidding me?

[...]

Doe: Did you go back into the bathroom?

Arevalos: You are ... you are crazy person! You ... you are.

Doe: I've been told that before.

Arevalos: You are very very unique. Very!

Doe: You did, you went back int the bathroom didn't you? I bet you did.

Arevalos: [Laughing] I'm not gonna respond to that at all, until I'm face to face with you.

Doe: Aw, come on.

Arevalos: Until I am face to face with you.

Doe: Oh come on, you know you went back in there thinking about me, huh? Thinking about touching me, wishing I was still in the bathroom with my ... my cute little vagina.

Arevalos: [Laughing] I'm not gonna respond to that young girl. [Laughing]

Doe: I'm not that young.

Arevalos: I know. I ... know how old you are.

Doe: [Snickering]

Arevalos: Hm. Oh yeah. I ... I know your attitude. I know what you're about.

Doe: Hm ... I'm not the only crazy one. You're a little dirty one too, touching me down there.

Arevalos: I don't know what you're talking about.

Doe: [Laughing] Oh really!

Arevalos: [Laughing] I gotta see your face again. I want to see how ... I want to see how your face looks when you re asking me these questions in person, that's what I want 'cause who's gonna tell me what kind of person you really are.

Doe: I don't think you liked my face[.] I thought you liked a different part of me.

Arevalos: I think ... I think you're blowing smoke right now because you're hiding behind the cell phone.

[Doc. No. 202–21.]

### *Arevalos' Criminal Conviction and Subsequent Collateral Challenge*

On March 11, 2011, within 48 hours of Doe's complaint, Arevalos was arrested and taken into custody. Officer Arevalos was criminally charged and convicted on November 17, 2011, of multiple sex crimes involving multiple victims. As to Plaintiff Jane Doe, the jury found Arevalos guilty of: sexual battery by restraint, asking for a bribe, assault and battery by a peace officer, and misdemeanor false imprisonment. On February 12, 2012, Arevalos was sentenced to eight years and eight months in prison.

On February 14, 2012, Arevalos filed a direct appeal of his conviction. The state court of appeal affirmed his conviction on all counts. On February 11, 2014, the California Supreme Court denied Arevalos' petition for review, and the judgment be-

came final. *See* Cal. Rule of Court 8.532(b)(2)(A).

On July 19, 2013, however, Arevalos filed a Writ of Habeas Corpus challenging his criminal convictions on the ground that the prosecution violated its duties under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to produce handwritten notes Doe prepared shortly after the alleged incident.[5] The notes omit any mention of a touching. On February 25, 2014, the San Diego Superior Court issued an order granting Arevalos' habeas petition, and vacating the sexual battery and assault convictions against Arevalos.

## SUMMARY JUDGMENT

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548.

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S.

574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). The opposing party must support its assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations ... or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed.R.Civ.P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers,* 971 F.2d 347, 355 (9th Cir.1992). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In other words, before the evidence is left to the jury, the judge needs to answer the preliminary question of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Id.* at 251, 106 S.Ct. 2505 (quoting *Schuylkill and Dauphin Improvement Co. v. Munson,* 81 U.S. 442, 448, 14 Wall. 442, 20 L.Ed. 867 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)],

---

**5.** The Superior Court has concurrent habeas jurisdiction over cases on matters that are not and could not be raised in a contemporane-ous appeal. *See In re Carpenter,* 9 Cal.4th 634, 646, 38 Cal.Rptr.2d 665, 889 P.2d 985 (1995).

its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. The Court may not make credibility determinations or weigh conflicting evidence. *See id.* The ultimate question on a summary judgment motion is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

### EVIDENTIARY OBJECTIONS

■ The evidence this Court may consider in resolving the parties' competing claims must be admissible: "It is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir.1988); Fed.R.Civ.P. 56(c)(2). Here, the City officially objects to four exhibits offered in support of Plaintiff's summary judgment motion. However, the Court need not rule on the City's objections because the Court did not rely on the challenged evidence in deciding Plaintiff's summary judgment motion.

■ In its Statement of Genuine Issues in Opposition to Plaintiff's motion, the City lodges an additional objection to the contents of the pretext calls between Arevalos and Doe. The City claims that "[a]ny representations made by Officer Arevalos during the pretext calls are irrelevant and do not bear on Plaintiff's state of mind at the time of the alleged incident." [*See* Statement of Genuine Issues in Opposition at Nos. 8, 15, 17, Doc. No. 226-2.] Additionally, the City claims that the "contents of the pretext calls are irrelevant to the issues raised in Plaintiff's Motion for Partial Summary Judgment because they were made after the subject incident, in a controlled environment, per Plaintiff's consent." [*See id.* at Nos. 24–48.] The Court overrules the City's objection, as Arevalos' statements during the pretext calls are directly relevant to the issues considered throughout this motion, and the pretext nature of the call does not render the resulting conversation inadmissible.

### DISCUSSION

### I. Vicarious Liability

Plaintiff first seeks to hold the City of San Diego vicariously liable for Officer Arevalos' tortious conduct. "The doctrine of respondeat superior is usually the basis of an employer's liability for injuries to third persons caused by employees' acts." 30 C.J.S. Employer—Employee § 206.

■ Under California's doctrine of respondeat superior, an employer may be held vicariously liable for torts committed by an employee within the scope of employment. *See Perez v. Van Groningen & Sons, Inc.*, 41 Cal.3d 962, 967, 227 Cal. Rptr. 106, 719 P.2d 676 (1986). The doctrine of respondeat superior only applies, however, if the plaintiff is able to prove that the employee's tortious conduct was committed within the scope of employment. *Id.* at 968, 227 Cal.Rptr. 106, 719 P.2d 676. The general rule is that where an employee commits acts of sexual misconduct during the course of his work, such acts are outside the scope of his

employment, and no vicarious liability attaches. *See, e.g., Maria D. v. Westec Residential Sec., Inc.,* 85 Cal.App.4th 125, 146–47, 102 Cal.Rptr.2d 326 (2000). However, an exception to this rule was crafted in *Mary M. v. City of Los Angeles,* 54 Cal.3d 202, 285 Cal.Rptr. 99, 814 P.2d 1341 (1991), in which the California Supreme Court decided that vicarious liability *can* extend to employers of on-duty police officers who commit sexual assaults. A brief review of *Mary M.* is essential, as the parties both discuss the case at length.

### A. Mary M.

In *Mary M.,* around 2:30 a.m., an on-duty uniformed police officer, Sergeant Leigh Schroyer, activated the red lights on his patrol car and stopped the plaintiff, Mary M., for erratic driving. He asked Mary M. to perform a field sobriety test; she did not perform well and began to cry. After she pleaded with the officer not to take her to jail, the officer ordered plaintiff to get in his patrol car. The officer drove plaintiff to her home and entered her house. The officer said he expected "payment" for driving her home instead of taking her to jail. She tried to get away, but the officer grabbed her hair and threw her on the couch. When she screamed, the officer covered her mouth and threatened to take her to jail. Plaintiff stopped struggling; the officer raped her and left. *Mary M.,* 54 Cal.3d at 207, 285 Cal.Rptr. 99, 814 P.2d 1341.

Mary M. sued both the officer and the City of Los Angeles. At trial, the City offered a jury instruction regarding vicarious liability. Based on the City's instruction, the jury found the City was vicariously liable for the officer's rape and awarded a $150,000 verdict against the City. On appeal, the appellate court reversed, holding the officer's felonious act was so unusual, startling, and uncharacteristic of the duties of a law enforcement agency that it was not "foreseeable" in the respondeat superior context. The court held as a matter of law that the City could not be vicariously liable for the officer's crime. *Id.* at 208, 285 Cal.Rptr. 99, 814 P.2d 1341.

Mary M. then appealed to the California Supreme Court. The ultimate issue was whether the City of Los Angeles could be held vicariously liable for the officer's actions. In deciding whether the police officer was acting within the scope of his employment, the Court stated that the "test" for determining whether an employee is acting outside the scope of employment is whether "in the context of the particular enterprise, an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." *Id.* at 214, 285 Cal. Rptr. 99, 814 P.2d 1341.

The California Supreme Court concluded that a city may be held vicariously for the sexual misconduct of a police officer. The court noted first that the proper inquiry was whether the risk of the employee's misconduct "was one that may fairly be regarded as typical of or broadly incidental to the enterprise undertaken by the employer." *Id.* at 217, 285 Cal.Rptr. 99, 814 P.2d 1341. And it further observed: "in view of the considerable power and authority that police officers possess, it is neither startling nor unexpected that on occasion an officer will misuse that authority by engaging in assaultive conduct.... Sexual assaults by police officers are fortunately uncommon; nevertheless, the risk of such tortious conduct is broadly incidental to the enterprise of law enforcement, and thus liability for such acts may appropriately be imposed on the employing public entity." *Id.* at 217–18, 285 Cal.Rptr. 99, 814 P.2d 1341.

Applied to the case, the court found that:

> plaintiff presented evidence that would support the conclusion that the rape arose from misuse of official authority. Sergeant Schroyer detained plaintiff when he was on duty, in uniform, and armed. He accomplished the detention by activating the red lights on his patrol car. Taking advantage of his authority and control as a law enforcement officer, he ordered plaintiff into his car and transported her to her home, where he threw her on a couch. When plaintiff screamed, Sergeant Schroyer again resorted to his authority and control as a police officer by threatening to take her to jail. Based on these facts, the jury could reasonably conclude that Sergeant Schroyer was acting in the course of his employment when he sexually assaulted plaintiff.

*Id.* at 221, 285 Cal.Rptr. 99, 814 P.2d 1341.

Subsequent to *Mary M.,* the Judicial Council of California approved CACI 3271, dealing with the scope of employment issue in cases of police misconduct. In pertinent part, the instruction provides:

> [*Plaintiff*] must prove that [*peace officer*] was acting within the scope of [his] [employment] when [*Plaintiff*] was harmed.

> The conduct of a peace officer is within the scope of [his] employment as a peace officer if all of the following are true:

> (a) The conduct occurs while the peace officer is on duty as a peace officer;

> (b) The conduct occurs while the peace officer is exercising [his] authority as a peace officer; and

> (c) The conduct results from the use of [his] authority as a peace officer.

CACI 3271.

### B. The Parties' Arguments

Plaintiff argues that Arevalos was in the scope of his employment because he was on duty, in uniform, and continually threatened arrest throughout the encounter, thereby taking advantage of his authority as a law enforcement officer to sexually abuse Plaintiff. [*See* Mot. at 12–20.] The City contends that vicarious liability is a question of fact that must be determined by the jury. [*See* Opp. at 2–15.] Moreover, the City argues that disputed facts preclude summary judgment on this issue. Specifically, the City contends that what happened between Plaintiff and Arevalos in the 7–Eleven bathroom is far from established. Further, the City contends that Plaintiff was a willing participant in the deal and was not forced or threatened to participate. According to the City, Plaintiff made a conscious decision to negotiate with Arevalos to avoid the consequences of her decision to drink and drive.

### C. Analysis

As a preliminary matter, contrary to the City's assertion, vicarious liability need not be determined by a jury. "Ordinarily, the determination whether an employee has acted within the scope of employment presents a question of fact; it becomes a question of law, however, when 'the facts are undisputed and no conflicting inferences are possible.'" *Mary M.,* 54 Cal.3d at 213, 285 Cal.Rptr. 99, 814 P.2d 1341 (quoting *Perez,* 41 Cal.3d at 1452, 227 Cal. Rptr. 106, 719 P.2d 676). The Court thus turns its attention to whether triable issues of fact remain with respect to whether Arevalos was acting within the scope of his employment with the SDPD at the time of his encounter with Plaintiff.

As summarized by CACI 3271, the question is whether any disputed facts remain with respect to whether (1) Arevalos' conduct occurred while on duty; (2) the conduct occurred while he exercised his authority as a peace officer; and (3) the conduct resulted from the use of his authority as a peace officer. *See* CACI 3271.

In this case, the City concedes that the following facts are undisputed:

1. At approximately 11 p.m. on the night of March 8, 2011, after going out in the Gaslamp area of downtown San Diego, Plaintiff Jane Doe was driving her convertible BMW when she was pulled over by on-duty San Diego Police Department Officer Anthony Arevalos. Officer Arevalos used his lights and loudspeaker to effectuate his stop of Plaintiff. [*City's Response to Undisputed Statement of Facts* at No. 1, Doc. No. 226–2.]

2. Officer Arevalos was "in uniform," and "on the job," including gun and other weaponry, and in his marked patrol car. [*Id.* at No. 2.]

3. After representing that Plaintiff had failed the alcohol breathalyzer tests, Officer Arevalos told Plaintiff they might be able to work something out in order for her to avoid receiving a DUI. [*Id.* at No. 5.]

4. Arevalos and Plaintiff agreed a deal could be struck, and agreed that Arevalos would accept her panties in exchange for a release without a DUI charge. [*Id.* at No. 6.]

5. They agreed to drive to a nearby 7–Eleven where Plaintiff would use the restroom to take off her panties, and Officer Arevalos followed her in his patrol car. She parked in front of the 7–Eleven and Officer Arevalos parked his patrol car next to her

car, effectively blocking her in. [*Id.* at No. 7.]

6. Once inside the 7–Eleven, Officer Arevalos got the key for the bathroom. [*Id.* at No. 11.] He then opened the bathroom door, and Plaintiff went into the bathroom. Plaintiff believed she would be going in alone. [*Id.* at No. 12.] Officer Arevalos followed Plaintiff into the single stall bathroom and shut the door. [*Id.* at No. 13.] Officer Arevalos stood between Plaintiff and the door. [*Id.* at No. 14.]

7. Officer Arevalos told Plaintiff he wanted to see her breasts, and she pulled up her shirt and bra and exposed her breasts. [*Id.* at No. 16.]

8. After Plaintiff and Arevalos left the bathroom, she took another breathalyzer test that registered .07. [*Id.* at No. 18.]

9. Officer Arevalos told Plaintiff he would contact her to let her know when all her paperwork was gone and she was "safe." [*Id.* at No. 19.] Officer Arevalos then released Plaintiff and allowed her to drive to work. [*Id.* at No. 20.] When Plaintiff arrived at work, Officer Arevalos sent her a text message stating that he would contact her at the end of the month. [*Id.* at No. 21.]

10. Later, in the pretext call between Plaintiff and Officer Arevalos, Arevalos stated: "I made the executive decision that night, it's like okay. I am not gonna do this girl, I'm not gonna screw her career. She has too much education, too much.... Now, unless I turn the paperwork in to the District Attorney's Office, then this thing's never gonna happen, okay?" [*Id.* at No. 25.]

██ The sum total of these undisputed facts, combined with the precedent set forth by *Mary M.*, demonstrates unequivocally that Officer Arevalos used his authority as a police officer throughout the entire interaction with Plaintiff. He detained her by using the lights on his patrol car; he required Plaintiff to take several breathalyzer tests; he asked Plaintiff what she was willing to do to get out of a DUI charge; he said she could give him her panties in exchange for not getting arrested; he followed her in his patrol car to the 7–Eleven, where he allegedly sexually assaulted and battered her; he again resorted to his authority by administering another breathalyzer test; finally, he reminded Plaintiff after the fact of his ability to turn her DUI paperwork over to the District Attorney's Office. Based on these undisputed facts, no reasonable jury could find that Arevalos was acting outside his scope of employment throughout his encounter with Plaintiff.

The City's contentions to the contrary are not persuasive. Primarily, the City argues that the inconsistencies in Plaintiff's story make it impossible to know what precisely happened between Plaintiff and Arevalos. For instance, the City points out that: (1) Doe testified at the criminal trial that she and Arevalos first started talking about "making a deal" at the scene of the initial traffic stop; but that (2) in her deposition she claimed that the eventual terms of the deal were negotiated outside the 7–Eleven.[6] Further, the City argues that: (1) in her motion, Doe claims that she had no idea what Arevalos was seeking from her until she was "lured

to the 7–Eleven"; but that (2) she admitted in her deposition that as she drove there, she imagined that he wanted something sexual. Even if the Court assumes the presence and materiality of these alleged inconsistencies, these facts fail to create a genuine issue of material fact with respect to the pervasive and improper use of authority by Officer Arevalos.

Next, the City devotes two-and-a-half pages to arguing that "The Evidence Establishes that Jane Doe was not Digitally Penetrated or Raped by Anthony Arevalos." [*See* Opp. at 9–11.] However, Jane Doe is not claiming that she was "raped,"[7] nor is this consideration directly relevant to the issue of vicarious liability in this context.

Finally, the City contends that "Plaintiff was a willing participant in this deal and was not forced or threatened to participate. She negotiated freely with the officer in deciding the terms of the deal. She admitted that she knew part of the 'deal' was that she was not going to get a DUI. This was what *plaintiff* wanted-to not get arrested for DUI." [Opp. at 13 (emphasis in original).] Again, this argument is largely inapposite to the question of whether Arevalos abused his authority as a police officer. But by stating that Plaintiff "got what she wanted" (i.e., to not get arrested), the City implicitly acknowledges that Arevalos took advantage of his ability to arrest her to elicit sexual favors from Plaintiff.

An Eastern District of California case, *Barsamian v. City of Kingsburg*, 597

---

**6.** These two statements are not mutually exclusive, so it is unclear what inconsistency the City believes resides within them.

**7.** The City contends that Doe has "consistently used the term 'rape' to describe what happened to her." [Opp. at 10.] The City's sole evidence in support of this assertion, howev-

er, is Doe's clearly hyperbolized statement that the San Diego Police Department "raped" her by allowing Arevalos to remain on the force despite numerous instances of prior misconduct. [*See* Doe Depo. 315:3–23, Doc. No. 226–8.]

F.Supp.2d 1054 (E.D.Cal.2009), cited by both parties, further solidifies the propriety of vicarious liability in this circumstance. There, a police officer was dispatched to a family disturbance call at the plaintiff's residence. The officer spoke to the plaintiff's mother, who told the officer that she wanted the plaintiff evaluated to determine if she was under the influence of narcotics. The officer spoke with the plaintiff on the front porch. The plaintiff asked the officer if he was going to arrest her and he stated "No." The officer did not state, at any time, that he was going to arrest plaintiff. At some point, the plaintiff and the officer moved from the front porch into the residence. The plaintiff offered the officer something to drink, and they talked while sitting at the kitchen table. After the plaintiff's parents left, the officer and the plaintiff talked a bit more, and as the officer was preparing to leave, they hugged and kissed. *Barsamian,* 597 F.Supp.2d at 1059–60.

After the kiss, it is undisputed that the officer and the plaintiff ended up in the plaintiff's bedroom. The parties dispute, however, how that occurred. According to the plaintiff, she expected the officer to leave the house after the kiss, and she immediately went to her bedroom. He followed her there. According to the officer, after the kiss, the plaintiff said she wanted to talk some more. They continued to talk in the living room where she asked him questions about his marriage and his family. He indicated he would rather not answer, told her he was leaving, and walked towards the door. At that moment, "she told me she needed to show me something and grabbed me and led me through the hallway." He went with her because he wanted to see what the plaintiff was going to show him, and the plaintiff led him into her bedroom. While both parties offered different accounts of what transpired in the bedroom, they both agree that the plaintiff performed oral sex on the officer. *Id.* at 1060–61.

The district court denied the plaintiff's motion for summary judgment, finding triable issues of fact as to whether "Officer Solis was exercising (or misusing) his authority as a police officer at the time the sexual act occurred or that the sexual act was a result of his use (or misuse) of authority." *Id.* at 1071. The court explained that, unlike *Mary M.,* the evidence did not demonstrate that Officer Solis physically transported the plaintiff to the bedroom, and there was no evidence that he controlled her at the time of the sexual act. *Id.* The court mentioned the fact that there was no evidence that the officer made any threats to arrest the plaintiff or take her to jail. Based on these facts, the court concluded:

> Given the evidence it cannot be concluded, as a matter of law, that Officer Solis misused official authority in obtaining, or to obtain, oral sex. Stated in the words of CACI 3721, it cannot be concluded, as a matter of law, that Officer Solis was exercising (or misusing) his authority as a police officer at the time the sexual act occurred or that the sexual act was a result of his use (or misuse) of authority. There are, of course, facts that cut both ways but whether a trier of fact ultimately believes that the sexual act occurred while Plaintiff was subject to Officer Solis's use (or misuse) of authority is for the trier of fact to decide.

*Id.* at 1071.

This case is quite different. The undisputed facts demonstrate that the sexual encounter occurred while—and because—Plaintiff was directly subject to Officer Arevalos' improper use of authority. He controlled her throughout the encounter, consistently reiterating his ability to arrest her for a DUI. Unlike the parties in *Bar-*

*samian,* Officer Arevalos and Doe were not simply enjoying a leisurely conversation around the kitchen table when a trip to the bedroom ensued. Rather, by taking advantage of his authority and control as a law enforcement officer, Arevalos struck a deal with Doe whereby he would receive her panties in exchange for not getting arrested.

For these reasons, the Court finds that the undisputed facts demonstrate that Arevalos was acting within the scope of his employment throughout his encounter with Jane Doe, and thereby **GRANTS** Plaintiff's motion for partial summary judgment on the issue of the City's vicarious liability.

## II. Sexual Assault and Battery

Next, Plaintiff moves for summary adjudication of her claims for sexual battery and sexual assault. The Court finds that the evidence produced by Plaintiff is "so one-sided" that Plaintiff must prevail as a matter of law. *See Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

### A. Sexual Assault and Battery Elements

In California, a person commits a sexual battery if he does any of the following:

(1). Acts with the intent to cause a harmful or offensive contact with an intimate part of another, and a sexually offensive contact with that person directly or indirectly results.

(2) Acts with the intent to cause a harmful or offensive contact with another by use of his or her intimate part, and a sexually offensive contact with that person directly or indirectly results.

(3) Acts to cause an imminent apprehension of the conduct described in paragraph (1) or (2), and a sexually offensive

contact with that person directly or indirectly results.

Cal. Civ.Code § 1708.5(a). The essential elements of a cause of action for assault are:

(1) defendant acted with intent to cause harmful or offensive contact, or threatened to touch plaintiff in a harmful or offensive manner;

(2) *plaintiff reasonably believed she was about to be touched in a harmful or offensive manner or it reasonably appeared to plaintiff that defendant was about to carry out the threat;*

(3) plaintiff did not consent to defendant's conduct;

(4) plaintiff was harmed; and

(5) defendant's conduct was a substantial factor in causing plaintiff's harm.

*Plotnik v. Meihaus,* 208 Cal.App.4th 1590, 1603–04, 146 Cal.Rptr.3d 585 (2012). As Plaintiff's claim is for sexual assault, she must demonstrate that she reasonably believed Defendant Arevalos was threatening to touch an intimate part of her body.

### B. Analysis

Plaintiff contends that the undisputed evidence demonstrates that Arevalos sexually assaulted and battered her. Plaintiff cites four primary evidences to satisfy her summary judgment burden. First, Plaintiff cites to the statements made by Arevalos to Plaintiff during the second pretext call. Second, Plaintiff contends that the Court may draw an adverse inference from Arevalos' invocation of his Fifth Amendment privilege during his deposition. Third, Plaintiff produces her own testimony regarding Arevalos' acts. Fourth— since rendered moot—Plaintiff introduces Arevalos' past criminal conviction of sexual battery and assault for his actions perpetrated against Plaintiff.[8] The Court finds

---

8. The Court considers the ramifications of the

reversal of Arevalos' criminal convictions in

that Plaintiff's evidence meets her burden of demonstrating the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

The most compelling piece of evidence produced by Plaintiff is the second pretext call between her and Arevalos.[9] Therein, when asked what he liked best about the bathroom encounter, Arevalos stated: "the instant moment that *I touched you*, the skin texture, the temperature, *the way it felt*, everything was like perfect"; "your vagina was very nice." Also, in response to a line of questioning regarding why Arevalos "stopped" before orgasm, Arevalos stated:

> I just didn't think you had enough time because you were in a rush, you were on the way out. . . . Yeah, that would have been ideal. You know it would have been perfect, would have been cool. But just because that did not happen . . . just because it was just timing. I mean I was trying to get you to work as soon as possible as well. . . . Well like I said, would I have liked it longer of course! Of course 'cause I wanted you to . . . be relaxed during it, and I . . . I didn't feel you at all relaxed during it, so I . . . was like, okay, you know what, let me just stop right now, in my mind, let me just stop right now and then we'll just go forward from here.

[*Id.*] While Arevalos never explicitly states that he touched an intimate part of Doe's body, the Court finds that his statements in the pretext call allow for only one reasonable interpretation: Arevalos committed an unwanted touching of an intimate body part of Jane Doe. In the sequence quoted above, nothing but the definition of "it" is left to the reader's imagination. Yet, even the City shies away from attempting to ascribe a benign interpretation to Arevalos' statements. Indeed, apart from an evidentiary challenge,[10] Arevalos' statements in the pretext call are left virtually unchallenged by the City. Arevalos' counsel, however, in his limited opposition to Plaintiff's summary judgment motion does argue that Plaintiff "overstates the significance" of the pretext calls, and that "Officer Arevalos never admitted touching [Doe]." [Arevalos Opp. at 8, Doc. No. 227.]

The evidence says otherwise. While Arevalos did not explicitly state that he touched Doe's vagina, his comments are nonetheless unequivocal: "the instant moment that I touched you, the skin texture, the temperature, the way it felt, everything was like perfect"; "your vagina was very nice"; "I didn't feel you at all relaxed during it, so I . . . was like, . . . let me just stop right now."

At oral argument, Arevalos' counsel quoted at length the San Diego Superior Court's order granting Arevalos' habeas petition, wherein the court cited *People v. Riel*, 22 Cal.4th 1153, 96 Cal.Rptr.2d 1, 998 P.2d 969 (2000), for the proposition that whether conduct constitutes an adoptive admission is a question for the jury to decide. [*Summary Judgment Hearing Transcript* at 23.] We need not, however, consider whether Arevalos' *conduct* constitutes an adoptive admission; his affirma-

---

detail *infra*.

9. Quoted at length *supra*.

10. The City objects to the admissibility of the pretext call, contending that the "contents are irrelevant to the issues raised in Plaintiff's Motion for Partial Summary Judgment because they were made after the subject inci-

dent in a controlled environment, per Plaintiff's consent." [City's Response, No. D.] As set forth previously the Court overrules the City's objection, as Arevalos' statements during the pretext cabs are directly relevant to issues presented, and the pretext nature of the call does not render the resulting conversation inadmissible.

tive *statements* describing the touching are enough.

■■■ Moreover, Arevalos does not deny the touching occurred. When asked in his deposition whether he touched Plaintiff's vagina, Arevalos invoked his Fifth Amendment privilege. [*See* Arevalos Depo. Vol. I, at 220:17–222:10.] Plaintiff contends that the Court may draw an adverse inference from Arevalos' silence. Unlike criminal cases, adverse inferences may be drawn from a defendant's invocation of the privilege against self incrimination in a civil proceeding. *See Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911 (9th Cir.2008). The City contends, however, that this rule should not apply because the adverse inference would be drawn against the City, not Arevalos. The City is mistaken. The inference is not offered to establish that the City committed the alleged torts, but, rather, to support a finding that Arevalos committed the alleged torts. As previously set forth, liability against the City is premised upon vicarious liability. Thus, the Court finds that Arevalos' invocation of his Fifth Amendment privilege serves as additional evidence supporting Plaintiff's burden of demonstrating the absence of a genuine dispute.

Finally, Plaintiff produces her own deposition testimony wherein she states that Arevalos "took his hand and started touching [her] vagina and started—he pushed the lips of my vagina apart and starting rubbing my vagina." [Doe Depo. at 193:2–4, Doc. No. 202–18.]

■■■ In all, the Court finds that Plaintiff has met her burden on summary judgment demonstrating an absence of ·a genuine issue of material fact as to her claims for sexual assault and battery. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Thus, the City now shoulders the burden of establishing that a genuine issue of fact exists.

*See Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348. In attempting to establish the existence or non-existence of a genuine factual dispute, the City must support its assertion by

(A) citing to particular parts of materials in the record, including depositions documents electronically information affidavits or declarations ... or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed.R.Civ.P. 56(c)(1).

The City contends that summary judgment is not warranted because Doe's allegations regarding the incident have been inconsistent. For instance, after Arevalos released her, Doe sent a message to her boyfriend, stating: "I can't believe how yucky I feel and I didn't even really have to do anything! It sucks to have someone hold that kinda power over you." [Doe Depo. at 204:8–24.] Doe's handwritten notes written shortly after the incident also do not mention that Arevalos touched her. The City contends that the inconsistencies in Doe's story create a credibility issue which must be decided by a jury.

Even if the evolution of Doe's story raises a credibility issue, the Court finds this "scintilla of evidence" insufficient to create a genuine issue of material fact. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. The result would be different if Doe had, at some time, *denied* a touching before alleging one. She never did.

By way of background, on the night of the incident, Doe spoke to San Diego Police Officer Kelly Besker regarding her encounter with Arevalos. Officer Besker instructed Doe to call the SDPD directly to report her allegations of Arevalos' misconduct. Officer Besker also instructed

Doe to prepare notes regarding the incident with Arevalos, including the location, name of the officer, description of the officer, the specific 7–Eleven store involved, and a description of Doe's vehicle. Doe complied with Officer Besker's instruction.

The resulting notes provide a far from comprehensive account of the events of the evening. In all, the notes contain approximately twelve bullet point notations summarizing Doe's encounter with Arevalos. Doe describes the bathroom incident in a scant thirteen words: "watched me take them off & said he want to see my ... breasts." [*Jane Doe Handwritten Notes,* Doc. No. 226–16.] Importantly, the notes do not deny that a touching occurred. At oral argument, the City's counsel contended that Doe "mention[ed] everything else that happened in the bathroom." [*Summary Judgment Hearing Transcript* at 8:24–25.] Not so. For example, the notes do not mention that Doe lifted her shirt to expose her breasts. Nor did Doe write anything about being touched, even in a non-intimate manner.[11] In short, the notes. describe little and determine less. The same is true for Doe's message to her boyfriend. Doe did not mention or deny a touching in the brief message ("I can't believe how yucky I feel and I didn't even really have to do anything!"). The message provides no more than a scintilla of evidence to suggest that no touching occurred. Finally, the Court notes that the "evolution" of Doe's story occurred within a very short time frame. While she did not mention a touching in the direct aftermath of the incident, the touching came to light within 18 hours.

As made clear at the summary judgment hearing, the significance attached by the City to Doe's handwritten notes is inextricably tied to Arevalos' habeas corpus proceeding. Indeed, the City places great weight on the vacatur of Arevalos' criminal conviction, and in the analysis conducted by the San Diego Superior Court in doing so. At the summary judgment hearing, the City contended that the reversal of Arevalos' criminal conviction "makes every bit of difference." [*Summary Judgment Hearing Transcript* at 6:21.] "With the vacation [sic] of these serious criminal convictions, there is now a serious question of fact as to what happened in that bathroom." [*Id.* at 7:20–22.] Despite the City's impassioned argument, the Court finds that the reversal of Arevalos' conviction does not create a genuine issue of material fact. The evidence before the Court—even absent proof of Arevalos' criminal conviction—undisputably demonstrates that Arevalos touched an intimate part of Doe's body. The reversal of Arevalos' criminal conviction has no bearing on the clear state of the evidence before the Court.

Moreover, Arevalos' conviction was reversed because of a *Brady* violation committed by the prosecution in failing to produce Doe's handwritten notes. The question of whether a *Brady* violation occurred during the criminal proceedings, and whether there are genuine issues of material fact remaining in this civil proceeding, are very different considerations. Significantly, the standards of proof in the two cases differ dramatically. The well-known requirement of "proof beyond a reasonable doubt" is constitutionally mandated for elements of a criminal offense.

---

**11.** While Officer Arevalos did not explicitly state in the second pretext call that he touched an intimate body part, he did admit, at least, a general touching. [*See Second Pretext Call* at 10, Doc. No. 202–21 ("the instant moment that I touched you, the skin texture, the temperature, the way it felt, everything was like perfect.").] No mention of *any* touching—sexual or otherwise—is made in the notes.

*Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true." CALCRIM 103. However, issues of fact in civil cases are determined by a preponderance of the evidence. *See* Cal. Evid.Code § 115 ("Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence."). The preponderance-of-the-evidence standard "simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *In re Angelia P.*, 28 Cal.3d 908, 918, 171 Cal.Rptr. 637, 623 P.2d 198 (1981) (internal quotation omitted.)

The Court acknowledges the Superior Court's determination that "[t]he contents of the pretext call are not such as to foreclose *any* argument that the conversation could be interpreted in different ways."[12] However, the Superior Court reached this conclusion in the context of a criminal trial, where the job of the defense is to create a "reasonable doubt" in the minds of the jurors. This conclusion is inapplicable here, where the Court considers not whether there is "literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505 (emphasis in original). Here, Arevalos' statements in the second pretext call serve as overwhelming proof of his tortious conduct, and Doe's handwritten notes create nothing more than a "metaphysical doubt as to the material facts" admitted to by Arevalos. *See Matsushita*, 475 U.S. 574 at 586, 106 S.Ct. 1348.

---

12. *Order Granting Petition for Writ of Habeas Corpus* at 1, Doc. No. 318–1 (emphasis add-

In conclusion, the Court finds that no triable issues of fact remain regarding Plaintiff's claims for sexual assault and battery. Plaintiff's evidence—particularly Arevalos' statements in the second pretext call—affirmatively establishes her claims, while the City produces only a scintilla of evidence to rebut Plaintiff's demonstration of the absence of material facts. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party.]") Accordingly, summary judgment must be entered in Plaintiff's favor.

### CONCLUSION

For the reasons set forth above, the Court **GRANTS** Plaintiff's motion for partial summary judgment in its entirety.

**IT IS SO ORDERED.**